**Ramiro GOMEZ, Plaintiff,**

v.

**CITY OF SOUTH BEND, Defendant.**

**No. S 82–320.**

United States District Court,
N.D. Indiana,
South Bend Division.

March 28, 1985.

Aladean M. DeRose, South Bend, Ind., for plaintiff.

Richard Hill, City Atty., Thomas L. Bodnar, Chief Deputy City Atty., South Bend, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

This case is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for alleged discrimination on the basis of national origin and under 42 U.S.C. § 1983 for alleged violations of the plaintiff's rights under the First and Fourteenth Amendments to the Constitution of the United States. This case was tried by the court without a jury on February 21 and 22, 1985 and the parties were given

until March 4, 1985 to file memoranda in support of their respective positions, which they have done. This Memorandum and Order contains the findings of fact and conclusions of law thereon pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.

### FINDINGS OF FACT

Plaintiff, Ramiro Gomez, a male hispanic, first came to the South Bend area in the summer of 1972 and stayed here until September 1973. During that time he voted in elections here but did not take any part in politics beyond voting. Mr. Gomez returned to the South Bend area in 1977 and worked at IUSB from November 1977 to March 1980 when he accepted a job with the St. Joseph County CETA program. In October 1980, the St. Joseph County CETA program was merged with the CETA program in the City of South Bend. At that time, plaintiff was hired as an EEO Specialist with the newly formed CETA consortium. In July 1981, Mr. Gomez was informed that his position was being eliminated due to a reduction in force and that he would be laid off, which he was in September 1981. During this time, plaintiff voted in elections and declared himself a Democrat for purposes of voting in the primaries. However, plaintiff made no political contributions to any party and did not campaign for any candidate for political office.

In July 1981, Mr. Gomez applied for the position of Assistant Personnel Director/Equal Employment Opportunity Officer for the City of South Bend by submitting his application to a personnel officer for the City. On the date of his application, Ramiro Gomez had a Master's degree with a concentration in public management and personnel. He was the EEO specialist for the CETA Consortium and had supervised the Community and Institutional Research Services program at IUSB for two years. He was also a former Marine Corps sargeant serving in Vietnam and in the Reserves.

Plaintiff testified in his deposition that he did not contact the City again with respect to the Assistant Personnel Director/EEO Officer position until September 1981 when he returned a phone call to Carolyn Threatt in response to a phone message received at his office while he was gone for unknown reasons. In the return call, Mr. Gomez was informed by Carolyn Threatt that he had been granted an interview for the Assistant Personnel Director/EEO Officer position but that his interview slot had been filled and that the interview would be rescheduled. According to the deposition of plaintiff, he did not contact the City again with respect to the job opening until approximately three weeks later and was informed that the position had been filled. However, the testimony of Carolyn Threatt and Fran Onion, both very credible witnesses, testified that the interviews were scheduled in late August 1981. Further, Mr. Jon Oppenheim was hired September 7 or 8, 1981 and the unsuccessful candidates for the position were notified in a letter dated September 8, 1981 of the employment decision. Mr. Kernan, also a very credible witness, testified that the hiring decision was made no more than a few days before the actual hiring. Based on these inconsistencies, the court's ability to observe Carolyn Threatt, Fran Onion and Mr. Kernan testify and the inability to observe plaintiff because he did not appear for trial, the court finds that the testimony of the three are more credible than the deposition testimony of plaintiff. Mr. Gomez filed a complaint with the South Bend Human Rights Commission on September 10, 1981.

The position of Assistant Personnel Director became open in 1981. The job description was then revised to add Equal Employment Opportunity duties prior to the posting of the job vacancy notice. Qualifications for the position were described as "any combination equal to a college degree in industrial and labor relations and 2 years experience in labor relations" as well as writing, analytical, legal interpretive abilities and inter-personal skills. The

duties of this position included preparatory contract negotiations, administration of collective bargaining agreements, grievance processing, affirmative action plan implementation and administration, among other things. A job vacancy notice with respect to the Assistant Personnel Director/EEO Officer position was sent to all City departments, the CETA Consortium, the Personnel Department for St. Joseph County as well as a number of other organizations, and was posted in the lobby of the County-City Building in South Bend. Ten applications for the position were received including two hispanics and five individuals were selected for a formal interview, including the plaintiff Ramiro Gomez, one of the hispanic applicants. Two of those selected for interviews were city employees and three were employees of the CETA Consortium. Two of those selected were white males, two were white females and one hispanic. The interviews were set up on very short notice and all persons selected for an interview were treated similarly. Fran Onion had her interview a few hours after the initial contact, Mike Seitz had his interview on the same day that he was called and Jon Oppenheim had less than a one day notice. Fran Onion, a secretary at the CETA Consortium testified that she took a call from the City Personnel Department early one afternoon for Ramiro Gomez. She looked diligently for plaintiff on both floors of the building occupied by the CETA Consortium, checked with the switchboard operator and with Gomez' boss and used the paging system in the building in an effort to locate plaintiff, but was unsuccessful. She further testified that she left a note propped up on plaintiff's phone in his office informing him to contact the City Personnel Department that day for an interview for the Assistant Personnel Director/EEO position.

When Mr. Gomez returned to the office after 4:30 o'clock P.M., he was advised of the message. He went back to his office for a while and had a conversation with Fran Onion after he emerged. He stated that he had attempted to call the Personnel Department but that no one answered.

The next morning he called and was told his interview slot had been filled.

Mr. Joseph Kernan, Controller for the City of South Bend, testified that he reviewed the applications that were submitted for the position of Assistant Personnel Director/EEO Officer, interviewed some of the candidates for the position and ultimately made the decision on the successful candidate. When he interviewed Jon Oppenheim, he told him that he had others to interview.

The applicants were selected for interviews on the basis of their applications and the qualifications disclosed therein. It was the City's policy and practice, after interviewing the selected applicants, to contact the applicant's supervisor if the applicant was a city employee with respect to the applicant's job performance and to review the employee's evaluations made annually as a matter of city practice by the employee's supervisors. If the applicant was not a city employee, the applicant's reference, employer, and former employers would be contacted.

Joseph Nagy, John Oppenheim's Supervisor, filed his annual employee evaluation on Mr. Oppenheim in his employee record. That report revealed that Mr. Oppenheim was a very good employee. The City did not contact any of Mr. Oppenheim's references, including Michael Barnes. Jane Cleaver, a very credible witness, testified that she was the Personnel Director of the Michiana CETA Consortium in 1981 and was the person who handled all inquiries about CETA Consortium employees with respect to salary, benefits and job performance from prospective employers. She gave Ramiro Gomez a negative evaluation based on his CETA job record, which included an extended probation period and the second lowest evaluation for a CETA Consortium employee of approximately 150 that were evaluated.

After interviewing the applicants, Mr. Jon Oppenheim, a white male, was selected by Mr. Kernan for the position of Assistant Personnel Director/EEO Officer on the ba-

sis of his job skills, his job performance as a city employee and his ability to work well with people and grasp the task at hand. No party leaders were contacted with respect to the hiring decision, which was the normal practice and no one suggested Mr. Oppenheim should get the job for any political reasons. Although political affiliation is important in some city jobs, it was not in the position of Assistant Personnel Director/EEO Officer and played no part in the decision making process. Mr. Oppenheim was not active in politics nor did he possess any political power.

Mr. Kernan discussed the appointment of Mr. Oppenheim with the Mayor of South Bend and probably the Mayor's Administrative Assistant since the position had some managerial responsibilities. Such discussions centered around the employee's past job performance, the fact that he worked for the City, the job he had done while working for the City, whether he was capable of handling the position and whether he was compatible with those he would work for and with.

The City of South Bend issued a Policy and Standard Procedure memorandum with respect to Employment Practices that became effective February 1, 1976 and was in effect at all relevant times incident to this case. The procedure portion of the memorandum contained the following provision:

> 4.4 *Special Hiring Policies*—Vacancies may be filled by promotion from within the City whenever possible. If a suitable candidate is not already available, a new employee may be recruited in accordance with the following practices ....

The City did not require that city employees reside within the South Bend City limits.

In 1981, 2% of the total population in the City of South Bend and 1.53% of its census defined labor force was hispanic. In St. Joseph County, the total labor force consisted of 115,896 persons, of which 1,248 were hispanic. Thus, hispanics constituted 1.08% of the labor force in St. Joseph County.

The City's statistical breakdown of personnel according to job classification and minority status is compiled annually and submitted to the Department of Labor as Form EE04. The City's statistics for the year ending June 30, 1981 revealed that the City employed 1,223 full time employees of whom 23 were hispanic, for a percentage of 1.8% hispanic city employees full time. Of the 107 full-time city employees designated professional, paraprofessional and official/administrator, two were hispanic, or approximately 1.9%. Even adding the part-time and/or temporary employees in these statistics, they do not show any significant discriminatory pattern.

Mr. Kernan testified that in 1981, the City began to experience a budget crunch and the position of Assistant Personnel Director/EEO Officer became a part-time position as a result.

At all times the successful applicant worked only two and one-half (2½) or three (3) days at the job of Assistant Personnel Director/EEO Officer. At the time this hiring decision was made, the City had just passed a budget providing for such a full-time position but with the knowledge that up to seven and one-half percent (7½%) of the anticipated revenues would not be approved by the State Board of Accounts of the State of Indiana. In fact, five percent (5%) of the projected revenues were cut by the State Board of Accounts. Since more than two-thirds of the City's budget was involved with wages and fringe benefits, and since many of the remaining costs were beyond the City's control (bonds, utility bills, etc.) the million dollar reduction was accomplished primarily by eliminating jobs. According to the testimony of Mr. Kernan, the Park, Police, and Fire Departments were among those joining the Personnel Department in losing positions. What had been a full-time job as Assistant Personnel Director/EEO Officer became a part-time job. The knowledge that this might be necessary was a known possibility, even when the job was initially posted. The successful applicant had the singular qualification of being able to work part-

time in the Personnel Department and part-time in the Bureau of Weights and Measures, a job for which he was already trained and qualified.

There is no evidence in the record to support a discrimination claim based on political nepotism or political associations.

## II.

In his complaint, plaintiff alleges a cause of action under 42 U.S.C. § 1983 for violation of his rights under the First and Fourteenth Amendments to the Constitution of the United States. Plaintiff specifically alleges that:

> Defendant's failure and refusal to hire plaintiff was based on nepotism and political partisanship in violation of plaintiff's constitutional rights to equal protection, freedom of association, and free expression guaranteed by the fourteenth and first amendments to the United States Constitution.

Plaintiff's Complaint, Count II, ¶ 7. In support of this allegation, plaintiff basically argues that the successful candidate for the position of Assistant Personnel Director/EEO Officer got the job because of his relationship to other individuals that were politically active, though he himself was not, and that such decision not to hire violated plaintiff's rights to freedom of association and freedom of speech as guaranteed by the First Amendment.

At the outset it should be noted that there are no freedom of speech or expression issues involved in this case. There are no allegations nor any evidence of any actions taken by plaintiff with respect to exercising these First Amendment rights in the context of this case. Rather, it is an alleged violation of plaintiff's First Amendment rights of freedom of association that provide the basis for plaintiff's claim under 42 U.S.C. § 1983.

In this case, the plaintiff is maintaining that his constitutional right of freedom of association was violated, not because he was involved in one political faction or another, but rather because he was not involved at all in politics. In support of his position that abstinence from politics constitutes protected activity, the plaintiff cites *Hudson v. Chicago Teachers Union Local 1*, 743 F.2d 1187 (7th Cir.1984), *McClure v. Cywinski*, 686 F.2d 541 (7th Cir.1982) and *Lipinski v. Dietrich*, 578 F.Supp. 235 (N.D.Ind.1984). Plaintiff's reliance on *Lipinski* appears misplaced as that case is grounded more on freedom of speech than association. However, *Hudson* and *McClure* contain language that arguably supports plaintiff's position of neutrality as protected activity although neither case explicitly holds that such right is of constitutional magnitude. *See Hudson v. Chicago Teachers Union Local 1*, 743 F.2d at 1193; *McClure v. Cywinski*, 686 F.2d at 544. In *Hudson*, the discussion of freedom of association was in the context of a due process analysis whereas in *McClure*, the Court merely assumed the right to be of constitutional magnitude for the purposes of that case on appeal but did not address the issue. This court is in basically the same position as the court in *McClure* in that it has not been referred to any authority directly holding that abstinence from politics constitutes protected activity. Although this court questions whether the freedom of association was intended to be interpreted or construed to include political neutrality within its bounds, it will for purposes of this case assume that it does.

Another issue that must be decided preliminarily is whether the law involving public employment and constitutional rights as developed in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) and their progeny is applicable in cases involving failure to hire or whether the doctrine is limited to discharge cases. Although the *Elrod* and *Branti* cases, as well as most cases applying the *Elrod/Branti* decisions, involved discharges, the rationale underlying those decisions indicates a broader application of the doctrine. The underlying rationale in those cases is that even though a person has no "right" to a valuable government

benefit and the government may deny the benefit for any number of reasons, it may not deny the benefit on a basis that infringes that person's constitutionally protected rights because to do so would permit the government to do indirectly what it could not do directly. *See, e.g., Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977); *Branti v. Finkel,* 445 U.S. at 514–15, 100 S.Ct. at 1292–93. Based on this rationale, it would appear that the *Elrod/Branti* decisions may be applicable in failure to hire cases despite the distinctions regarding property interests in acquiring versus maintaining a job. *Cf. LaFalce v. Houston,* 712 F.2d 292 (7th Cir.1983), *cert. denied,* ——— U.S. ———, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984). Accordingly, this court will now turn to the merits of plaintiff's claim.[1]

A review of the leading cases involving the doctrine that public employment may not be conditioned upon an individual's exercise of a constitutional right clearly indicate that it's application is not without bounds. In *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the plaintiff had been employed in a state college system for ten years, the last four as a junior college professor under a series of one year contracts. In his last year under contract, plaintiff publicly criticized the policies of the college administration, and the Board of Regents at the college voted not to renew his contract. The Court held that although a person has no "right" to a valuable government benefit and "even though the government may deny him the benefit for any number of reasons, it may not deny a benefit to a person on a basis that infringes his consti-

tutionally protected interests—especially his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." 408 U.S. at 597, 92 S.Ct. at 2697. The Court upheld the reversal of summary judgment because the plaintiff had not shown, because he did not have the opportunity, that the decision not to renew his contract was in fact made in retaliation for his exercise of his constitutional right of free speech.

In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court was faced with a case involving patronage dismissals of public employees. The facts in that case disclose that in December 1970, the Republican Sheriff of Cook County was replaced by a Democrat Sheriff. It was the practice of the Sheriff of Cook County, when he assumed the office from a different political party, to replace non-civil-service employees of the Sheriff's office with members of his own political party when the existing employees lacked or failed to obtain requisite support from, or failed to affiliate with his party. Consequently, the employees were discharged or threatened with discharge solely for the reason that they were not affiliated with or sponsored by the Democratic party. After discussing at length the patronage system and its interrelationship with the effective functioning of the government, the Court held that patronage dismissals were unconstitutional under the First and Fourteenth Amendments because of the severe restrictions placed thereby on political beliefs and associations. 427 U.S. at 372–73, 96 S.Ct. at 2689–90.

---

**1.** The Supreme Court's latest foray into another "political thicket" was not greeted with universal approbation. See dissent of Justice Powell (joined by Justices Rhenquist and, in part, by Justice Stewart in *Branti v. Finkle,* 445 U.S. 507, 521, 100 S.Ct. 1287, 1296, 63 L.Ed.2d 574 (1980) and the concurring opinion of Judge, now Chief Judge Aldisert in *Loughney v. Hickey,* 635 F.2d 1063 (3d Cir.1980). For a more direct frontal attack *see* Flintner, *Bring Back the Spoils System to Make Government Work,* B. Globe Oct. 15,

1980 at 17, col. 1 and Peters, *A Kind Word for the Spoils System,* Wash. Monthly Sept. 1976 at 29. On the general subject of "political thickets" the last and most masterful dissent of Justice Frankfurter in *Baker v. Carr,* 369 U.S. 186, 266, 82 S.Ct. 691, 737, 7 L.Ed.2d 663 (1962) is still required reading. For the other side of the coin *see* Hoffinger, *First Amendment Limitations on Patronage Employment Practices,* The U. of Chicago Law Review, Vol. 49 pp. 181.

In *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court reaffirmed that employment by a governmental unit cannot be based on an impermissible reason, i.e., exercise of a constitutional right which in that case was plaintiff's exercise of his First Amendment right of freedom of speech. The Court recognized, however, that in some cases the same decision would have been reached had the incident involving the exercise of the constitutional right not occurred. Accordingly, the Court enunciated a three step process for analyzing cases involving both constitutionally protected and unprotected activity as follows:

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

429 U.S. at 287, 97 S.Ct. at 576 (footnote omitted).

In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court was faced with a similar fact pattern as that in *Elrod*-county employees being threatened with discharge from employment solely because of their political beliefs. Again the Court found violations of the First and Fourteenth Amendments even when no coercion is involved in changing political beliefs. 445 U.S. at 517, 100 S.Ct. at 1294. The Court noted, however, that consistent with *Elrod,* party affiliation may be an acceptable requirement for some types of government positions—namely policymaking and confidential type positions. *Id.*

The most recent Supreme Court case involving public employment and constitutional rights was *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). That case involved a freedom of speech right under the First Amendment and the Court found no violation. In discussing the parameters of the plaintiff's First Amendment free speech rights, the Court stressed the importance of balancing the government's interest in effectively and efficiently fulfilling its responsibilities to the public with the nature of the employees exercise of his or her right.

■ Reviewing the evidence in this case in light of these decisions, the plaintiff has failed to show any entitlement to relief on his claim under 42 U.S.C. § 1983. He has failed to show that the defendant's decision not to hire him was based on his exercise of his right of political neutrality or was even a "substantial" or "motivating" factor in that decision. Furthermore, the defendant has shown by a preponderance of the evidence that plaintiff would not have been hired even in the absence of the protected conduct.

The facts in this case disclose that the plaintiff was not active in politics nor was the successful candidate, Jon Oppenheim. Plaintiff was selected for an interview for the position of Assistant Personnel Director/EEO Officer along with four other applicants but was not interviewed because he was unavailable when contacted by the defendant with respect thereto. There is no evidence in the record that the decision of whom to interview or to hire was based on any knowledge of what political party, if any, the applicants were associated with and there was no evidence that political activity, or lack thereof, in any way entered into the decision to hire Jon Oppenheim. Further, there is no evidence from which such a fact could be reasonably inferred. Rather, Jon Oppenheim was hired for the position of Assistant Personnel Director/EEO Officer because of his job performance as an employee with the City and the City's policy of hiring from within. Thus, plaintiff has failed to show that his

lack of political activity was a substantial or motivating factor in the decision to hire Jon Oppenheim instead of him and the defendant has shown that it would have reached the same decision based on the job performance of the candidates, even if the plaintiff had shown that politics had entered into the decision, which he did not.

### III.

Plaintiff also alleges that defendant discriminated against him on the basis of national origin in its refusal to hire him in violation of 42 U.S.C. § 2000e. In support of this claim, the plaintiff maintains that he is entitled to relief under Title VII on two alternative theories: disparate impact and disparate treatment. The Supreme Court has distinguished between these two types of Title VII cases, *see, e.g., U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 713 n. 1, 103 S.Ct. 1478, 1481 n. 1, 75 L.Ed.2d 403 (1983); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), and has enunciated different standards of proof for the two theories. *Cf. Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Accordingly, each theory will be discussed separately.

### A. DISPARATE IMPACT

■ Under the disparate impact theory of discrimination in Title VII cases, a plaintiff can establish a *prima facie* case of discrimination by showing that the facially neutral standards or policy in question operate in a discriminatory manner, i.e. disproportionately exclude the minority from employment. Once the plaintiff has met this burden, the employer must show that the requirement or policy has a manifest relationship to the employment in question. If the employer shows that the qualification is job related, then the burden shifts back to the plaintiff to show that other selection devices without a similar

discriminatory effect would "serve the employers legitimate interest in 'efficient and trustworthy workmanship.'" *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977); *see Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Caviale v. State of Wisconsin, Dept. of Health and Social Services,* 744 F.2d 1289 (7th Cir. 1984).

■ In order for Gomez to establish a *prima facie* case of discrimination under this analysis, he must show: (1) that he was qualified for the position of Assistant Personnel Director/EEO Officer; (2) that he was a member of a group protected under Title VII; and (3) that the City's "hire/promote from within" policy imposed a disproportionate burden upon hispanics qualified for the position of Assistant Personnel Director/EEO Officer. Plaintiff's application for the position of Assistant Personnel Director/EEO Officer indicates that he had the formal educational qualifications for the position and was selected for an interview on that basis. He did not, however, immediately respond to a call to set up the interview as the other applicants had and consideration of his application ceased at that time. Accordingly, the "hire from within" policy was not applied to this plaintiff and under *Carpenter v. Board of Regents of University of Wisconsin System,* 728 F.2d 911, 915 (7th Cir.1984), the plaintiff has failed to prove that he was really injured by the policy alleged to have a disparate impact, his claim for discrimination under this theory must fail. Further, even if plaintiff had shown the application of the policy in his case, his claim would fail for another reason: plaintiff has failed to show that the "hire/promote from within" policy places a disproportionate burden on eligible hispanics.

In this case, plaintiff is not challenging the policy as discriminatory at all levels of City employment but rather only at the professional, para-professional and "managerial" levels. The plaintiff, however, has

not defined what he meant by "managerial" position in the context of this case nor does the evidence disclose any category with that label in the statistical evidence presented. In his arguments with respect to statistics, the plaintiff refers to professionals, para-professionals and administrative. This court therefore assumes for purposes of this case that the plaintiff was referring to the category labeled officials/administrators in the statistics with respect to his label of "managerial." Thus, plaintiff's basic claim is that the "hire/promote from within" policy places a disproportionate burden on qualified hispanics not employed by the City for positions with the City in the professional, para-professional and managerial levels. In support of his claim, plaintiff presented statistical evidence of city employment and applications therefor as well as evidence that one allegedly qualified hispanic was not even granted an interview for the job of Assistant Personnel Director/EEO Officer.

■ Although statistics may be used to prove discrimination under the disparate impact theory, it is essential that the correct statistics be used in the analysis. *See Liberles v. County of Cook*, 709 F.2d 1122 (7th Cir.1983). In employment discrimination cases, the composition of the work force rather than the population as a whole is the standard to be employed. *See Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Further, the qualifications of the work force may be essential factors when upper level jobs are at issue. *See Metrocare v. Washington Metropolitan Area Transit Authority*, 679 F.2d 922 (D.C.Cir. 1982); *Rivera v. City of Wichita Falls*, 665 F.2d 531, 541 (5th Cir.1982). Further, in order to establish a *prima facie* case of discrimination under disparate impact, the plaintiff must show that the application of the policy results in a significantly discriminatory pattern. *See Dothard v. Rawlinson*, 433 U.S. at 329, 97 S.Ct. at 2727.

■ The statistical evidence presented in this case reveals that in 1981, 2% of the City's total population and 1.53% of its census-defined labor force was hispanic. Of the city's 1,223 employees as of June 30, 1981, 23 were hispanic which equals 1.8% hispanic city employees. In 1981, of the city's 107 full time city employees designated professional, para-professional and official/administrator, 2 were hispanic, or approximately 1.9%. This statistical evidence certainly does not support a finding of a significant discriminatory pattern against hispanics at the upper level positions of city employment but rather is more probative of an absence of discrimination in recruiting. *See E.E.O.C. v. Federal Reserve Bank*, 698 F.2d 633, 662 (4th Cir.1983). Furthermore, since city employees are not required to live within the South Bend city limits, it would also be possible to use St. Joseph County statistics with respect to available hispanic labor force. However, this would result in even less supportive statistics for plaintiff.

■ Nor do plaintiff's statistics with respect to the positions held by hispanics in city employment in general buttress his argument of disparate impact at the professional, para-professional and managerial level based on the "hire/promote from within" policy. They merely indicate that the city employees eligible for promotion include 1.5% hispanic which is in proportion to the percentage of hispanics in the work force in South Bend. Statistics that would show that the number of hispanics qualified for professional, para-professional and managerial positions in South Bend is significantly higher than the percentage employed in such position might buttress his argument but no such statistics were presented. Further, plaintiff's statistics on the number of hispanics that applied for employment with the City of South Bend are not supportive of his position either since his claim is only based on the upper level positions. Accordingly, plaintiff has failed to prove by statistics his claim of discrimination under Title VII on the basis of disparate impact.

■ Further, plaintiff's reliance on the fact that Ricardo Parra was not selected for an interview does not lend support to

his claim of disparate impact. The evidence clearly shows that five individuals were selected for interviews: 2 females, 2 white males, and plaintiff, an hispanic. The fact that another hispanic not in any way connected with this case was not selected for an interview, certainly does not support plaintiff's claim that the "hire/promote from within" policy had a disparate impact on outside hispanics.

Accordingly, plaintiff has failed to prove his Title VII discrimination claim under the disparate impact theory.

## B. DISPARATE TREATMENT

■ In Title VII cases based on disparate treatment, unlike disparate impact cases, proof of discriminatory intent is critical. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Accordingly, the analysis used in disparate treatment cases is somewhat different than in disparate impact cases. Further, although the general framework for analyzing the liability portion of a class disparate treatment case is essentially comparable to the framework for a private, nonclass Title VII case, the content of the specific stages of that framework will be different. *See Coates v. Johnson & Johnson*, 756 F.2d 524, 532 (7th Cir.1985). The case presently before the court is an individual disparate treatment action so this court will focus only on that analysis.

The factual inquiry in a Title VII disparate treatment case is whether the defendant intentionally discriminated against the plaintiff. *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The plaintiff has the ultimate burden of showing intentional discrimination, *see Burdine, supra* at 253, 101 S.Ct. at 1093; *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), and can do so "either

by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Aikens, supra* 460 U.S. at 716, 103 S.Ct. at 1482 *quoting Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Thus, the bottom line is—which party's explanation of the employer's motivation does the court believe. *Aikens, supra* 460 U.S. at 716, 103 S.Ct. at 1482.

■ In a disparate treatment case, the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. If plaintiff succeeds, a rebuttable presumption arises that the defendant unlawfully discriminated against the plaintiff and the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for defendant's employment action. If defendant carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reason, but were a pretext for its discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577–78, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Coats v. Johnson & Johnson, supra*, at 531–32.

■ To establish a prima facie case for disparate treatment, the plaintiff must prove by a preponderance of the evidence that he was a member of a minority, applied for an available position for which he was qualified and was rejected under circumstances which give rise to an inference of unlawful discrimination. *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. at 1093. In *McDonnell Douglas*, the Supreme Court described the last element as requiring a showing "that, after his rejection, the position remained open and the employer continued to seek applicants from person of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. at 1824. The Court noted,

however, that the standard was not inflexible and that the facts plaintiff must show to be entitled to the inference of discrimination will vary according to the type of employment practice involved. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13; *see Burdine, supra,* 450 U.S. at 253–54 n. 6, 101 S.Ct. at 1093–94 n. 6; *Coates, supra,* at p. 531.

In the case presently before the court, the plaintiff has proven a *prima facie* case of disparate treatment. The plaintiff is a hispanic, had the formal educational qualifications for the Assistant Personnel Director/EEO Officer position, was rejected, and a white male was hired. However, the defendant has articulated legitimate, nondiscriminatory reasons for its decision to hire Jon Oppenheim instead of plaintiff.

First, the practice of the defendant in hiring new employees was to accept applications, conduct interviews and check with the applicant's employer with respect to his job performance prior to selecting the successful candidate. The evidence in this case clearly reveals that plaintiff was selected for an interview on the basis of his application but was not interviewed because he failed to promptly respond to a call to set up the interview. Accordingly, the employment process ceased at this point with respect to plaintiff. However, the defendant has presented evidence that Mr. Gomez's job performance at his then employment was less than acceptable and thus would have played a part in the selection process as to his qualifications. However, plaintiff's failure to promptly respond to the interview call, thus halting the employment application process on his behalf cannot in any way be construed as evidence of discrimination against plaintiff. All applicants selected for an interview were treated the same. Second, the City had a valid, longstanding policy of hiring from within and the evidence in this case shows that Jon Oppenheim was a good city employee and was hired under the policy. Third, the City presented reliable evidence of fiscal reasons for hiring the successful candidate. Accordingly, this court finds

that the defendant has rebutted the presumption of discrimination by producing evidence that Jon Oppenheim was preferred for legitimate, nondiscriminatory reasons. Accordingly, the plaintiff then had the burden to show that the reasons were not the true reason for the employment decision and this burden then merged with his ultimate burden of persuading the court that he has been the victim of intentional discrimination.

The court finds that plaintiff has failed to prove by a preponderance of the evidence that he was a victim of intentional discrimination. As indicated in the previous section of this opinion, the statistics with respect to hispanic employment by the City do not reveal any significant disparity of treatment and thus cannot be used to show intentional discrimination. Likewise, the issue with respect to defendant's hire/promote from within policy has been carefully analyzed and found to be nondiscriminatory.

## IV.

### CONCLUSION

For the foregoing reasons, plaintiff has failed to prove any claim under Title VII or 42 U.S.C. § 1983. Judgment to be entered for defendant. Costs are assessed against the plaintiff. SO ORDERED.